UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

TALHA S. PASHA,

                                    Plaintiff,

                    – *against* –

NEW YORK STATE DEPARTMENT
OF HEALTH,

                                    Defendants.

**OPINION & ORDER**

22-cv-3355 (ER)

R<small>AMOS</small>, D.J.:

Talha Pasha, proceeding *pro se*, filed this action against the New York State

Department of Health (the "DOH"), alleging employment discrimination, hostile work

environment, and retaliation in violation of Title VII of the Civil Rights Act of 1964, 42

U.S.C. § 1981 ("Section 1981"), and the New York State Human Rights Law

("NYSHRL").  Doc. 187.[1]  Before the Court is the DOH's motion to dismiss the

complaint pursuant to Federal Rules of Civil Procedure 12(b)(1), 12(b)(2), 12(b)(5), and

12(b)(6).  Doc. 237.  For the reasons set forth below, the motion is GRANTED in part

and DENIED in part.

## I.    BACKGROUND

### A.  Factual Background[2]

Pasha is a Muslim man of Pakistani descent, Punjabi ethnicity, and Asian race.

Doc. 187 ¶ 14.

Pasha applied for a staff position posted by The ExecuSearch Group, a staffing

agency now known as the Tandym Group ("Tandym").  *Id*. ¶ 15.  Pasha provided Melissa

D'Esposito, Tandym's director of nursing, with his resume on April 7, 2020.  *Id*.  The next

---

[1] Pasha also brought this action against the Tandym Group f/k/a The ExecuSearch Group and Anida Fregjaj, but they were voluntarily dismissed from this action on July 2, 2025.  *See* Docs. 187, 252.

[2] The following facts are based on the allegations in the amended complaint, which the Court accepts as true for purposes of the instant motion.  *See, e.g.*, *Koch v. Christie's International PLC*, 699 F.3d 141, 145 (2d Cir. 2012).

day, on April 8, 2020, Pasha was assigned by Tandym to work at a drive-through COVID-19 testing site at Stony Brook University Hospital ("Stony Brook Hospital") in Stony Brook, New York. *Id.* ¶ 16. The testing site was managed by the DOH and the New York State Department of Environmental Conservation (the "DEC"). *Id.* ¶ 17.

The testing site consisted of four stops, and each stop involved different stages of the registration, check-in, and testing process. *Id.* ¶¶ 18, 19–20, 28, 29. Stops 1 and 3 were supervised by the DEC. *Id.* Stop 2 was purportedly overseen by the DOH, but no DOH supervisors were assigned to Stop 2. *Id.* ¶¶ 18, 25. Rather, Stop 2 was operated by non-supervisory Tandym employees. *Id.* ¶ 25. Stop 4 was jointly managed by DOH and DEC employees. *Id.* ¶ 30.

Pasha was initially assigned to work at Stop 2 of the testing site. *Id.* ¶ 33. At Stop 2, Tandym employees were responsible for checking in and registering individuals for COVID-19 testing. *Id.* ¶ 20. One Tandym employee at Stop 2 worked inside a Trailer ("Trailer 1") and was responsible for distributing appointment sheets and registration forms to the other Tandym employees assigned to Stop 2. *Id.* ¶ 26. The other Tandym employees at Stop 2 worked outside but had access to another trailer ("Trailer 2") during their shifts. *Id.* ¶ 47. During Pasha's tenure, DOH protocols permitted a maximum of four people per trailer. *Id.* However, on at least one other occasion, more than four Tandym employees occupied Trailer 2. *Id.* On at least one occasion when there was inclement weather, Pasha could not use Trailer 2 during his breaks because of the capacity limit. *Id.* ¶ 49.

At the start of Pasha's employment, he worked five days per week. *Id.* ¶ 50. However, in June 2020, one of his scheduled shifts was taken away and he worked four days instead. *Id.* ¶ 52. This change to his schedule was purportedly made in order to provide new Tandym staff, who were White, with shifts. *Id.*

On June 5, Pasha asked DOH supervisors Brian Parente and Debra Rietmann for permission to attend Friday prayers at a mosque near Stony Brook Hospital. *Id.* ¶ 62. On

June 5 and June 12, 2020, the DOH supervisors permitted Pasha to attend Friday prayers at the mosque. *Id.* ¶ 63.

However, Parente informed Pasha on June 13, 2020, that he would no longer be allowed to leave for Friday prayers. *Id.* ¶ 67. At that time, two Wednesday shifts were available. *Id.* ¶¶ 66, 71. One shift became available because a Tandym employee, Olivia Gozlan, was giving up her Wednesday shift. *Id.* ¶ 71. Gozlan informed Pasha that she needed someone to cover this shift, and Pasha said he was willing to do so. *Id.* Gozlan and Pasha agreed to communicate this request to D'Esposito. *Id.* Pasha also discussed his interest in swapping his Friday shift for a Wednesday shift with Parente. *Id.* ¶ 67. Parente approved of the swap and told Pasha that he would contact Tandym, who appeared to make final scheduling decisions, to request the change. *Id.*[3]

That same day, Rietmann emailed DOH employee Amy Yost, another DOH employee, requesting permission to switch Pasha's Friday shift in order to accommodate "a conflict." *Id.* ¶ 68; Doc. 187-1. Rietmann then emailed Tandym employee Anida Fregjaj requesting that Pasha be taken off the Friday schedule and switched with an employee on the Wednesday schedule. *Id.* ¶ 69. Fregjaj stated that Tandym would "work on the schedule to accommodate [the request] and ensure there is coverage." *Id.* ¶ 70; Doc. 187-1. Fregjaj scheduled a phone call with Pasha to discuss the request. *Id.* ¶ 72.

The phone call to discuss Pasha's request did not take place until June 25, 2020. *Id.* ¶ 73. At that time, Gozlan's Wednesday shift was still available because D'Esposito emailed several Tandym employees that day to notify them about the shift and ask whether any were interested in switching shifts with Gozlan. *Id.* ¶ 85; Doc. 187-1. Pasha replied to D'Esposito to again say that he was interested. *Id.* D'Esposito stated that there

---

[3] In the instant amended complaint, Pasha does not specify whether he approached Parente with the scheduling request or whether Parente proactively offered Pasha the option of switching his Friday shift for a different day. Doc. 187 ¶ 67. However, in his original complaint, Pasha alleged that it was Parente who offered him the option of switching. Doc. 2 ¶ 9.

could not be a switch, since Gozlan was already staffed on Fridays, but asked whether he wanted to be staffed on Wednesdays in addition to his existing shifts. *Id.*

Later that day, Fregjaj had a phone call with Pasha about his accommodation request. *Id.* ¶ 73. On that call, Fregjaj announced that she was now responsible for approving scheduling requests and that D'Esposito, who appeared to have managed previous scheduling requests, was "too easy on the staff by allowing support staff members to schedule their own shift swaps." *Id.* ¶ 79. Fregjaj denied Pasha's request to switch to the Wednesday shift. *Id.* ¶ 74. She announced a new policy against shift swapping among Tandym employees, which would be in effect from that point forward. *Id.* ¶ 79. However, on at least one occasion thereafter, Fregjaj approved a shift swap request from employees who were White. *Id.* ¶ 83.

On June 26, 2020, Parente was notified about Tandym's denial of Pasha's request but refused to intervene. *Id.* ¶ 86. Parente stated that he could no longer allow Pasha to leave the testing site during his Friday breaks to pray at the mosque. *Id.*

After the denial of Pasha's request, he continued to work on Fridays. When he worked on Fridays, Pasha prayed at Stony Brook Hospital during his breaks, rather than at the mosque. *Id.* ¶ 103.

On July 30, 2020, DOH employee Amy Yost emailed DOH supervisors announcing that all New York state testing sites would thereafter be "closed sites," which meant that once employees signed in for their shift, they would not be permitted to leave the site until the end of their shift. *Id.* ¶ 87. If employees left the site during their shift, they would not be permitted back and would be permanently removed from the scheduling roster. *Id.* Despite the new closed site policy, there were several instances in which employees were permitted to leave the site for various reasons (e.g., fill up their car with gas, get food and drinks from restaurants, and attend medical appointments). *Id.* ¶ 88. Most of these employees were White. *Id.*

After his accommodation request was denied, Tandym employees started speaking to Pasha in a disrespectful tone. *Id*. ¶ 91. Pasha did not access Trailer 2 during his shifts in order to avoid violating the trailer's capacity limit. *Id*. ¶¶ 47, 92. Furthermore, when the site was busy because Tandym employees took extended breaks, the Tandym employee assigned to Trailer 1 refused to assist Pasha. *Id*. ¶ 96.

On one occasion, Sarai Maldonado, a Tandym employee, told Pasha "pray for more sun somewhere else" and "when you get fired you can pray at home." *Id*. ¶ 93. On November 13, 2020, after Pasha attempted to assist her with a backlog of cars at Stop 2, Maldonado told Pasha, "[W]e don't need help from you" and "go back on break." *Id*. ¶ 97.

On November 26, 2020, William Kellowitz, a Tandym employee, saw Pasha separating cars with individuals who had appointments from cars with individuals who did not have appointments. *Id*. ¶ 98. Kellowitz then approached Pasha in an "aggressive manner," telling him, "[Y]ou people never do anything right." *Id*. Pasha was directing the cars separately because individuals without appointments required registration forms. *Id*.

On December 3, 2020, Pasha's schedule was changed so that he then worked on Thursdays rather than Fridays, and was assigned to Stop 3, under the supervision of the DEC. *Id*. ¶ 104.

On February 23, 2021, Pasha emailed D'Esposito to report that Wendy Pacheco, a Tandym employee, called him a "snitch" and threatened to get him terminated. Doc. 187 ¶ 108; Doc. 242-1. Pacheco made this comment after Pasha reported to the DOH that she had been using Trailer 2 while assigned to data entry tasks, which were normally conducted at another location. *Id*. As a result of Pacheco working in Trailer 2, Pasha was unable to use the trailer during his breaks because of the capacity limit. *Id*.

On April 23, 2021, while working at Stop 3, Bob McCormick, a DEC supervisor, called Pasha "Taliban." *Id*. ¶¶ 114, 120. On April 26, 2021, McCormick called Pasha

5

"Taliban" again. *Id.* ¶ 121. Pasha allegedly threatened to report his conduct to the DOH if it continued, but there is no allegation that Pasha ever reported these incidents. *Id.* ¶ 122.

Pasha was terminated on April 28, 2021. *Id.* ¶ 123. The DOH stated that he was terminated because he was "unprofessional" with colleagues and because of his repeated conflicts with colleagues. *Id.* ¶¶ 123–27; Doc. 187-1. D'Esposito purportedly told Pasha that the decision to terminate him was made by Parente based on input from DEC supervisor McCormick, who no longer wanted to work with Pasha. *Id.* ¶ 129.

The amended complaint alleges that on separate occasions, two other Tandym employees who were minorities were terminated from the Stony Brook Hospital testing site. *Id.* ¶¶ 130–31. One of the employees, Rashawn Haynes, was terminated by Parente. *Id.* ¶ 130. The second employee, an unnamed Black woman, was terminated by DEC supervisor Paul Maggio. *Id.* ¶¶ 130–31. Her termination occurred after she refused to stand where Maggio instructed her to stand. *Id.* ¶ 131.

The fatality of at least one employee purportedly occurred at the testing site. Doc. 242 at 6.

### B. Procedural Background

Pasha filed this action on April 25, 2022, against the DOH and Tandym, alleging employment discrimination and retaliation based on his Asian race, Islamic religion, and Pakistani national origin, in violation of Title VII. Doc. 2.

On August 10, 2023, Pasha filed a motion seeking to amend his complaint. Doc. 32. At a pre-motion conference held on September 22, 2023, the Court referred the parties to mediation, and stated that if mediation was not successful, a briefing schedule would be set for Pasha's motion to amend. Mediation was unsuccessful, and on December 4, 2023, Pasha filed a motion for leave to file an amended complaint. Doc. 42. The next day, the Court granted Pasha leave to file a motion to amend the complaint and set a briefing schedule on the motion. Doc. 41.

On January 9, 2024, Pasha filed a proposed amended complaint. Doc. 44. Less than two weeks later, on January 22, 2024, Pasha filed a letter with the Court requesting to make "corrections" to his pleading and included a further revised version of the proposed amended complaint. Doc. 47. On January 26, 2024, the Court granted Pasha's request to resubmit the proposed amended complaint with corrections. Doc. 48. On January 30, 2024, Pasha filed another version of the proposed amended complaint. Doc. 49. This proposed amended complaint included a hostile work environment claim and claims under Section 1981 and the NYSHRL. *Id.* It also added allegations of discrimination on the basis of ethnicity. *Id.*

The DOH and Tandym opposed Pasha's motion for leave to file an amended complaint, Doc. 42. Docs. 50, 52. On September 19, 2024, the Court granted in part Pasha's motion. Doc. 120. The Court granted the motion only as to his allegations of discrimination based on his ethnicity and Section 1981 and NYSHRL claims of discrimination. *Id.* The Court denied Pasha's request to add the DEC as a defendant, or to allege discrimination based on his gender. *Id.* Pasha was directed to file an amended complaint. *Id.*

On October 29, 2024, without leave of Court, Pasha filed yet another motion for leave to file an amended complaint, seeking to add Fregjaj as a defendant and six additional claims. Doc. 133.[4] On November 21, 2024, the DOH and Tandym filed oppositions to the motion. Docs. 145, 147. The Court denied this request because Pasha failed to include a copy of the proposed amended complaint and only provided a brief explanation in support of the proposed amendments. Doc. 150.

On January 16, 2025, Pasha filed a second motion to add Fregjaj as a defendant and to include the additional claims. Docs. 160, 161. The Court denied this motion but

---

[4] Pasha sought to add the following claims: (1) hostile work environment, (2) disparate treatment, (3) discrimination in contract formation, (4) discrimination in contract performance, (5) retaliation, and (6) failure to enforce contracts. Doc. 133.

granted Pasha "an extension to file his amended complaint," limited to adding Fregjaj as a defendant and adding "the claims he believes are appropriate in accordance with the Court's order of September 19, 2024."  Doc. 162.

On January 31, 2025, Pasha filed an amended complaint, including Fregjaj as a defendant.  Doc. 176.[5]  Pasha's amended complaint also added new defendants, causes of action, allegations, and exhibits.  *Id*.  It included four DOH employees, Amy Yost, Anita Pedulla, Brian Parente, and Debra Rietmann (together, the "DOH employees"), in their professional capacities.  *Id*.  It added Title VII, Section 1981, and NYSHRL causes of action.[6]  The amended complaint introduced new factual allegations about the Stony Brook Hospital testing site operations and staffing, as well as Tandym's hiring and scheduling processes.  Lastly, it included several exhibits, some of which contained correspondence between Pasha and Tandym employees.[7]

On February 7, 2025, Pasha requested to amend his complaint to include Fregjaj's name change and 17 specific corrections.[8]  Doc. 185.  On February 10, 2025, the Court

---

[5] Tandym and Fregjaj were voluntarily dismissed as defendants on July 2, 2025.  Doc. 252.

[6] The amended complaint includes Section 1981 claims of discrimination in contract formation and discrimination in contract performance.  Pasha also raises Title VII, Section 1981, and NYSHRL claims of (1) differential treatment in job duties; (2) disparate impact based on race, religion, ethnicity, or national origin; (3) disparate treatment; (4) denial of equal pay or benefits for equal work; (5) failure to address or prevent racial, religious, ethnic, or national origin harassment; (6) failure to accommodate religious practices; (7) failure to provide reasonable accommodations; (8) failure to provide equal opportunities in work assignments, training, or resources; (9) harassment; (10) harassing conduct; (11) hostile work environment; (12) illegal termination of employment; (13) discrimination in assignment, re-assignment, or termination; (14) segregation or isolation in the workplace, unequal enforcement of workplace policies or disciplinary actions; and (15) retaliation.

[7] The exhibits in Pasha's amended complaint include:  (1) correspondence related to Pasha's Equal Employment Opportunity Commission charge against the DOH (Exhibits A-D); (2) the resume that Pasha sent to Tandym (Exhibit E); (3) correspondence between Tandym and DOH employees regarding Pasha's scheduling change request (Exhibit F); (4) Pasha's correspondence with Tandym employees regarding his scheduling change request (Exhibit G); (5) Pasha's certificate of appreciation from the Glen Oaks Volunteer Ambulance Corps (Exhibit H); (6) correspondence between Tandym and DOH employees regarding Pasha's termination (Exhibit I); and (7) a letter from DEC employee Paul Maggio regarding Pasha's employment (Exhibit J).

[8] Pasha requested to correct Anida Fregjaj's name in the complaint because she changed her name to Anida Shyti.  Doc. 185.

granted that request.  Doc. 186.  On February 10, 2025, Pasha filed the instant amended complaint, reflecting Fregjaj's name change and the other specific corrections.  Doc. 187.

The DOH filed the instant motion to dismiss the amended complaint pursuant to Federal Rules of Civil Procedure 12(b)(1), 12(b)(2), 12(b)(5), and 12(b)(6) on April 25, 2025.  Doc. 237.

## II.    LEGAL STANDARDS

### A.  12(b)(1) Motion to Dismiss Standard

Pursuant to Rule 12(b)(1), the Court must dismiss a case for lack of subject matter jurisdiction if the Court "lacks the statutory or constitutional power to adjudicate it." *Makarova v. United States*, 201 F.3d 110, 113 (2d Cir. 2000) (citing Fed. R. Civ. P. 12(b)(1)).  The party asserting subject matter jurisdiction bears the burden of establishing that jurisdiction exists by a preponderance of the evidence.  *Morrison v. National Australia Bank Limited*, 547 F.3d 167, 170 (2d Cir. 2008) (quoting *Makarova*, 201 F.3d at 113).  The Court accepts all material factual allegations in the complaint as true.  *National Resource Defense Council v. Johnson*, 461 F.3d 164, 171 (2d Cir. 2006).  But the Court does not presume the truthfulness of the complaint's jurisdictional allegations.  *Frisone v. Pepsico, Inc.*, 369 F. Supp. 2d 464, 469–70 (S.D.N.Y. 2005) (quoting *Augienello v. Federal Deposit Insurance Corp.*, 310 F. Supp. 2d 582, 588 (S.D.N.Y. 2004)).  When evaluating a Rule 12(b)(1) motion, the Court may consider evidence outside of the pleadings to resolve the disputed jurisdictional fact issues.  *Zappia Middle East Construction Co. Ltd. v. Emirate of Abu Dhabi*, 215 F.3d 247, 253 (2d Cir. 2000); *see also Morrison*, 547 F.3d at 170 (citing *Makarova*, 201 F.3d at 113).  However, the Court should refrain from drawing inferences in favor of the party asserting subject matter jurisdiction on a Rule 12(b)(1) motion.  *People United for Children, Inc. v. City of New*

*York*, 108 F. Supp. 2d 275, 283 (S.D.N.Y. 2000) (citing *Atlantic Mutual Insurance Co. v. Balfour Maclaine International Ltd.*, 968 F.2d 196, 198 (2d Cir. 1992)).

Where, as here, a party also seeks dismissal on Rule 12(b)(6) grounds, the Court must consider the Rule 12(b)(1) motion first, *Baldessarre v. Monroe-Woodbury Central School District*, 820 F. Supp. 2d 490, 499 (S.D.N.Y. 2011), *aff'd*, 496 F. App'x 131 (2d Cir. 2012), because "disposition of a Rule 12(b)(6) motion is a decision on the merits, and therefore, an exercise of jurisdiction," *Chambers v. Wright*, No. 05-cv-9915 (WHP), 2007 WL 4462181, at *2 (S.D.N.Y. Dec. 19, 2007) (quoting *Magee v. Nassau County Medical Center*, 27 F. Supp. 2d 154, 158 (E.D.N.Y. 1998)).

### B. 12(b)(2) Motion to Dismiss Standard

A plaintiff "opposing a motion to dismiss under Rule 12(b)(2) for lack of personal jurisdiction has the burden of establishing that the court has jurisdiction over the defendant." *BHC Interim Funding, LP v. Bracewell & Patterson, LLP*, No. 02-cv-4695 (LTS) (HBP), 2003 WL 21467544, at *1 (S.D.N.Y. June 25, 2003) (citing *Bank Brussels Lambert v. Fiddler Gonzalez & Rodriguez*, 171 F.3d 779, 784 (2d Cir. 1999)). A plaintiff "must establish the court's jurisdiction with respect to each claim asserted." *Charles Schwab Corp. v. Bank of America Corp.*, 883 F.3d 68, 83 (2d Cir. 2018) (quoting *Sunward Electronics, Inc. v. McDonald*, 362 F.3d 17, 24 (2d Cir. 2004)).

To meet this burden, a plaintiff must plead facts sufficient for a *prima facie* showing of jurisdiction. *Whitaker v. American Telecasting, Inc.*, 261 F.3d 196, 208 (2d Cir. 2001). The Court construes all the plaintiff's allegations as true and resolves all doubts in its favor. *Casville Investments, Ltd. v. Kates*, No. 12-cv-6968 (RA), 2013 WL 3465816, at *3 (S.D.N.Y. July 8, 2013). "However, a plaintiff may not rely on conclusory statements without any supporting facts, as such allegations would lack the factual specificity necessary to confer jurisdiction." *Art Assure Ltd., LLC v. Artmentum GmbH*, No. 14-cv-3756 (LGS), 2014 WL 5757545, at *2 (S.D.N.Y. Nov. 4, 2014) (citation modified).

10

### C.  12(b)(5) Motion to Dismiss Standard

Under Rule 12(b)(5), a case may be dismissed upon a finding that defendants have not been adequately served with process.  If a defendant challenges service, the plaintiff bears the burden of proof to establish its adequacy.  *Dickerson v. Napolitano*, 604 F.3d 732, 752 (2d Cir. 2010).  A court may dismiss an action when it appears that "there is simply no reasonably conceivable means of acquiring jurisdiction over the person of the defendant."  *Romandette v. Weetabix Co., Inc.*, 807 F.2d 309, 311 (2d Cir. 1986) (quoting *Stanga v. McCormick Shipping Corp.*, 268 F.2d 544, 554 (5th Cir. 1959)).

### D.  12(b)(6) Motion to Dismiss Standard

To survive a motion to dismiss pursuant to Rule 12(b)(6), "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'"  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).  A claim is facially plausible "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."  *Id*. (citing *Twombly*, 550 U.S. at 556).  The plaintiff must allege sufficient facts to show "more than a sheer possibility that a defendant has acted unlawfully."  *Id*. (citing *Twombly*, 550 U.S. at 556).  However, this "flexible plausibility standard" is not a heightened pleading standard.  *In re Elevator Antitrust Litigation*, 502 F.3d 47, 50 n.3 (2d Cir. 2007) (citation modified), and "a complaint . . . does not need detailed factual allegations" to survive a motion to dismiss.  *Twombly*, 550 U.S. at 555.

The question on a motion to dismiss "is not whether a plaintiff will ultimately prevail but whether the claimant is entitled to offer evidence to support the claims."  *Sikhs for Justice v. Nath*, 893 F. Supp. 2d 598, 615 (S.D.N.Y. 2012) (quoting *Villager Pond, Inc. v. Town of Darien*, 56 F.3d 375, 378 (2d Cir. 1995)).  Indeed, "the purpose of Federal Rule of Civil Procedure 12(b)(6) is to test, in a streamlined fashion, the formal sufficiency of the plaintiff's statement of a claim for relief without resolving a contest

11

regarding its substantive merits" or "weigh[ing] the evidence that might be offered to support it." *Halebian v. Berv*, 644 F.3d 122, 130 (2d Cir. 2011). Thus, when ruling on a motion to dismiss pursuant to Rule 12(b)(6), the Court accepts all factual allegations in the complaint as true and draws all reasonable inferences in the plaintiff's favor. *Nielsen v. Rabin*, 746 F.3d 58, 62 (2d Cir. 2014). In considering a Rule 12(b)(6) motion, a district court may also consider "documents attached to the complaint as exhibits, and documents incorporated by reference in the complaint." *Doe v. New York University*, No. 20-cv-1343 (GHW), 2021 WL 1226384, at *10 (S.D.N.Y. Mar. 31, 2021) (quoting *DiFolco v. MSNBC Cable LLC*, 622 F.3d 104, 111 (2d Cir. 2010)).

In the context of discrimination claims, plaintiffs "need not allege facts establishing each element of a *prima facie* case of discrimination," but "must at a minimum assert nonconclusory factual matter sufficient to nudge [his] claims across the line from conceivable to plausible" in order to survive a motion to dismiss. *Equal Employment Opportunity Commission v. Port Authority of New York & New Jersey*, 768 F.3d 247, 254 (2d Cir. 2014) (quoting *Iqbal*, 556 U.S. at 680).

### E. *Pro Se* Litigants

The Court remains obligated to construe a *pro se* complaint liberally and to interpret a *pro se* plaintiff's claims as "rais[ing] the strongest arguments that they suggest." *Triestman v. Federal Bureau of Prisons*, 470 F.3d 471, 474 (2d Cir. 2006) (citing *Pabon v. Wright*, 459 F.3d 241, 248 (2d Cir. 2006)). The obligation to be lenient while reading a *pro se* plaintiff's pleadings "applies with particular force when the plaintiff's civil rights are at issue." *Jackson v. New York State Department of Labor*, 709 F. Supp. 2d 218, 224 (S.D.N.Y. 2010) (citing *McEachin v. McGuinnis*, 357 F.3d 197, 200 (2d Cir. 2004)). Nevertheless, "*pro se* status 'does not exempt a party from compliance with relevant rules of procedural and substantive law.'" *Triestman*, 470 F.3d at 477 (quoting *Traguth v. Zuck*, 710 F.2d 90, 95 (2d Cir. 1983)). To survive a motion to dismiss pursuant to Rule 12(b)(6), a *pro se* plaintiff's pleadings still must contain "more than an

unadorned, the defendant-unlawfully-harmed me accusation." *Iqbal*, 556 U.S. at 678.  A

*pro se* complaint that "tenders naked assertion[s] devoid of further enhancement" will not

suffice.  *Id*. (internal quotation marks omitted) (quoting *Twombly*, 550 U.S. at 557).

### III.    DISCUSSION

#### A.  Pasha's Addition of Defendants, Claims, and Factual Allegations

This Court previously granted leave for Pasha to amend his complaint to add

Section 1981 and NYSHRL employment discrimination claims and allegations of ethnic

discrimination.  Doc. 120.  Notwithstanding the limited scope of the Court's grant, in the

amended complaint, Pasha added four additional defendants—DOH employees Amy

Yost, Anita Pedulla, Brian Parente, and Debra Rietmann—and new Title VII claims,

allegations, and exhibits.  Doc. 187.  His memorandum in opposition to the motion also

includes several email exchanges attached as Exhibit A.  Doc. 242-1.

##### 1.  *New Defendants*

The DOH argues that Pasha's Title VII claims against the DOH employees should

be dismissed as a violation of Rule 4 and Rule 15(c)(1)(C), and because individuals

cannot be subject to Title VII liability.  Doc. 238 at 13–14; Doc. 246 at 5–6.  Pasha argues

that service to the DOH employees was not required because the DOH employees sued in

their official capacity are not new defendants.  Doc. 242 at 5–6.  He also argues that this

amendment relates back to the original pleadings under Rule 15(c)(1)(C), so the new

defendants should be permitted in the instant amended complaint.  *Id*.

Notwithstanding Pasha's Rule 4 and Rule 15(c)(1)(C) arguments, the DOH

employees cannot be subject to liability under Title VII because Title VII does not allow

for individual liability.  *Wrighten v. Glowski*, 232 F.3d 119, 120 (2d Cir. 2000)

("[I]ndividuals are not subject to liability under Title VII.").  The Title VII claims against

the DOH employees are therefore dismissed.

2. *New Claims and Factual Allegations*

The DOH argues that Pasha's newly asserted claims and allegations beyond the scope of the Court's prior order should be dismissed, as "[d]istrict courts in [the Second Circuit] have routinely dismissed claims in amended complaints where the court granted leave to amend for a limited purpose and the plaintiff filed an amended complaint exceeding the scope of the permission granted." *Palm Beach Strategic Income, LP v. Salzman*, 457 F. App'x 40, 43 (2d Cir. 2012); *Jones v. H&M Hennes & Mauritz*, No. 23-cv-4778 (LTS), 2023 WL 8113404, at *3 (S.D.N.Y. Nov. 20, 2023). Pasha argues that the Court may consider new claims and allegations under the liberal pleading standard for *pro se* litigants and because they merely render his prior allegations more definite and precise. Doc. 242 at 4. Pasha also asserts that the claims and allegations should not be dismissed because they could have been asserted in his original complaint. *Id*.

Pasha argues that the Court should consider new facts raised "to the extent that they are consistent with the complaint, treating the new factual allegations as amending the complaint." *Davila v. Lang*, 343 F. Supp. 3d 254, 267 (S.D.N.Y. 2018) (first citing *Walker v. Schult*, 717 F.3d 119, 122 n.1 (2d Cir. 2013), and then citing *Brooks v. Jackson*, No. 11-cv-6627 (JMF), 2013 WL 5339151, at *3 (S.D.N.Y. Sept. 23, 2013)).

Notwithstanding Pasha's *pro se* status, the newly asserted Title VII claims will be dismissed for exceeding the scope of the Court's prior leave to amend. *Jones*, 2023 WL 8113404, at *3 (dismissing new claims against new defendants because they exceeded the extent of *pro se* plaintiff's leave to replead).

General allegations that the testing site operations and staffing procedures favored employees who are White do not encompass events related to those originally pleaded. Thus, these allegations, Doc. 187 ¶¶ 38–46, 55, will not be considered.

However, the Court will consider the allegations from the exhibit introduced in Pasha's opposition. Doc. 242-1. The exhibit includes emails in which Pasha reports to Tandym the incident in which Pacheco called Pasha "snitch" and threatened that he

14

would have to find another job. The exhibit also contains emails in which Tandym notifies DOH of Pasha's report. The allegations in the exhibit are consistent with Pasha's allegations in the amended complaint as they relate to this incident and Pasha's reporting of it. *See* Doc. 187 ¶ 108. In fact, the DOH even cites to the exhibit in an attempt to rebut the retaliation claim. Doc. 246 at 8. Therefore, the exhibit will be considered as part of the instant amended complaint. *See Davila*, 343 F. Supp. 3d at 267.

### B. Eleventh Amendment Immunity

Pasha brings Section 1981 and NYSHRL claims against the DOH and four DOH employees in their official capacity. Doc. 187 ¶¶ 1, 3. The DOH argues that such claims are barred by Eleventh Amendment sovereign immunity. Doc. 246 at 3–5.

#### 1. Section 1981 and NYSHRL Claims Against the DOH

In general, the Eleventh Amendment bars private individuals from suing nonconsenting States in federal court. *Clissuras v. City University of New York*, 359 F.3d 79, 81 (2d Cir. 2004). New York state has not waived its Eleventh Amendment immunity for Section 1981 suits in federal courts. *Evans v. New York State Department of Health*, Nos. 98-7160L, 98-7930CON, 1999 WL 568052, at *1 (2d Cir. July 30, 1999). New York state has also not waived sovereign immunity with respect to NYSHRL lawsuits. *Quadir v. New York State Department of Labor*, 39 F. Supp. 3d 528, 537 (S.D.N.Y. 2014). Therefore, Section 1981 and NYSHRL claims are barred by sovereign immunity.

Eleventh Amendment immunity "extends beyond the states themselves to state agents and state instrumentalities that are, effectively, arms of a state." *Woods v. Rondout Valley Central School District Board of Education*, 466 F.3d 232, 236 (2d Cir. 2006) (internal quotation marks omitted). Thus, "under the doctrine of sovereign immunity, an individual may not sue a state, its agencies, or its officials in federal court, absent that state's consent or an express statutory waiver of immunity." *Leon v. Rockland Psychiatric Center*, 232 F. Supp. 3d 420, 429 (S.D.N.Y. 2017). The DOH, as an agency of New York State, is entitled to sovereign immunity. *Harris v. New York State*

15

*Department of Health*, 202 F. Supp. 2d 143, 178 (S.D.N.Y. 2002) (dismissing 42 U.S.C. § 1983 claims against the DOH on the grounds of sovereign immunity).

Pasha argues that 42 U.S.C. § 5151 (the Stafford Act), 44 C.F.R. § 206.11, and FEMA Policy FP-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 abrogate the DOH's sovereign immunity by imposing an affirmative anti-discrimination duty on recipients of disaster assistance programs.  Doc. 242 at 5.

The DOH has not abrogated or waived sovereign immunity by accepting FEMA funds because neither 42 U.S.C. § 5151, 44 C.F.R. § 206.11, nor FEMA Policy FP-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 contains an express waiver of immunity.  A court will only find that there was an express waiver if the statute at issue demonstrates an intent to do so with "the most express language or by such overwhelming implications from the text as (will) leave no room for any other reasonable construction."  *Sank v. City University of New York*, No. 10-cv-4975 (RWS), 2011 WL 5120668, at *5 (S.D.N.Y. Oct. 28, 2011) (quoting *Edelman v. Jordan*, 415 U.S. 651, 673 (1974)); *Laday v. Ramada Plaza Hotel Laguardia*, No. 07-cv-0450 (BMC), 2007 WL 526613, at *4 (E.D.N.Y. Feb. 13, 2007) (dismissing 42 U.S.C. § 1983 claims against New York because the state did not consent to suit in federal court); *In re World Trade Center Disaster Site Litigation*, 521 F.3d 169, 186 (2d Cir. 2008) (permitting suit against non-state actor because New York and New Jersey explicitly enacted a broad waiver for sovereign immunity for it).

Furthermore, Congress has not made "a clear legislative statement" suggesting obvious intent to abrogate immunity from suit.  *Seminole Tribe of Florida v. Florida*, 517 U.S. 44, 55 (1996).  Accordingly, the Court dismisses the Section 1981 and NYSHRL claims against the DOH for lack of subject matter jurisdiction.

2.  *Section 1981 and NYSHRL Claims Against the DOH Employees*

The DOH argues that the Section 1981 and NYSHRL claims against the DOH employees should also fail under the doctrine of sovereign immunity, and that the claims do not satisfy the *Ex parte Young* exception.  Doc. 238 at 13 n.8.  Pasha does not respond

16

to this argument but generally asserts that the DOH abrogated its sovereign immunity by accepting funds from federal disaster assistance programs. Doc. 242 at 5.

The narrow exception to state sovereign immunity in *Ex parte Young*, 209 U.S. 123 (1908), applies to suits seeking prospective injunctive relief against state officials acting in violation of federal law. *State Employees Bargaining Agent Coalition v. Rowland*, 494 F.3d 71, 95 (2d Cir. 2007) (quoting *In re Deposit Insurance Agency*, 482 F.3d 612, 617 (2d Cir. 2007)) (internal quotation marks and citation omitted).

Here, the *Ex parte Young* exception does not apply because Pasha does not allege an ongoing violation of federal law. *State Employees Bargaining Agent Coalition*, 494 F.3d at 95. Further, the injunctive relief that Pasha seeks is in the form of "reasonable religious accommodations" policies, which he does not allege that the individual DOH defendants have the authority to establish. Doc. 187 at 36; *Shipman v. New York State Office of Persons with Developmental Disabilities*, No. 11-cv-2780 (GBD)(FM), 2012 WL 1034903, at *3 (S.D.N.Y. Mar. 26, 2012) (dismissing ADA claims against individual defendants because plaintiff failed to allege that any individual defendant had the authority to satisfy plaintiff's request for injunctive relief). Thus, the Court dismisses Section 1981 and NYSHRL claims against the DOH employees.

## C. Discrimination Claim

Pasha raises Title VII discrimination claims under both a disparate treatment and failure to accommodate theory.

### 1. Disparate Treatment

To establish a *prima facie* case for employment discrimination in violation of Title VII under a disparate treatment theory, Pasha must show that (1) he is a member of a protected class; (2) he was qualified for the position he held; (3) he suffered an adverse employment action; and (4) the adverse action took place under circumstances giving rise to the inference of discrimination. *Soloviev v. Goldstein*, 104 F. Supp. 3d 232, 247 (E.D.N.Y. 2015). At the pleading stage, Pasha need only "sustain a *minimal* burden of

17

showing facts suggesting an inference of discriminatory motivation." *Littlejohn v. City of New York*, 795 F.3d 297, 311 (2d Cir. 2015). Pasha's discrimination claim hinges upon whether he sufficiently alleges adverse employment actions that give rise to an inference of discrimination.[9] An "adverse employment action" is one that causes a "materially adverse change" in the terms and conditions of employment. *Galabya v. New York City Board of Education*, 202 F.3d 636, 640 (2d Cir. 2000). To be materially adverse, such a change must be "more disruptive than a mere inconvenience or an alteration of job responsibilities." *Terry v. Ashcroft*, 336 F.3d 128, 138 (2d Cir. 2003) (quoting *Crady v. Liberty National Bank & Trust Co. of Indiana*, 993 F.2d 132, 136 (7th Cir. 1993)). An inference of discrimination can arise from circumstances including "the employer's criticism of the plaintiff's performance in ethnically degrading terms; or its invidious comments about others in the employee's protected group; or the more favorable treatment of employees not in the protected group; or the sequence of events leading to the plaintiff's discharge.'" *Littlejohn*, 795 F.3d at 312 (quoting *Leibowitz v. Cornell University*, 584 F.3d 487, 502 (2d Cir. 2009)).

Pasha argues that he was subject to adverse employment actions in the form of the denial of his religious accommodation request and his termination. Doc. 242 at 8–9.[10] He further argues that these actions were motivated by discrimination on the basis of his race, religion, ethnicity, and national origin. *Id.*

---

[9] The parties do not dispute that Pasha is a member of a protected class, nor that he was otherwise qualified for his position. Doc. 238 at 20.

[10] Pasha also argues that he was subject to adverse employment actions because of the DOH's closed site policy, which restricted employees from leaving and returning to the testing site during their shifts, and his outdoor worksite placement at Stop 2. Doc. 187 ¶¶ 47, 49, 87. The DOH's closed site policy does not constitute an adverse employment action because it does not entail a material loss of employee benefits or any similar adverse action recognized in the Second Circuit. *Terry*, 336 F.3d at 138 (listing examples of materially adverse changes). And even if his worksite placement constituted an adverse employment action because it entailed greater exposure to weather and to COVID-19 relative to the employees staffed inside Trailer 1, Pasha has not plausibly alleged that the staffing decision was motivated by discrimination. *Id.*

The Court finds that the denial of Pasha's religious accommodation is an adverse employment action. When Pasha worked on Fridays following the denial, he was not able to pray at his mosque, which is "more disruptive than a mere inconvenience." Doc. 187 ¶ 103; *Crady*, 993 F.2d at 136.

Pasha also sustains his minimal burden of showing an inference of discrimination with respect to the denial of his request. Pasha alleges that two Wednesday shifts were available at the time he made his request to swap his Friday shift for a Wednesday shift, and that he made his interest in the shift known a number of times. *Id*. ¶¶ 66, 71. Specifically, Pasha alleges that D'Esposito emailed him, and other Tandym employees, announcing that Gozlan's Wednesday shift was available and requesting if anyone was interested in switching days with her. Doc. 187-1. Pasha replied to D'Esposito that he was interested in taking the Wednesday shift. *Id*. D'Esposito then told Pasha that Gozlan was already staffed on Fridays, so a shift swap would not be possible, but asked whether Pasha was interested in adding Gozlan's Wednesday shift to his current schedule. Doc. 187 ¶ 85; Doc. 187-1. Separately, Pasha's interest in the Wednesday shift was made known to Fregjaj, but Fregjaj later denied Pasha's accommodation request. Doc. 187 ¶ 79. However, Pasha alleges that Fregjaj approved at least one scheduling request for a White employee despite rejecting Pasha's request and telling Pasha there would be a no shift-swapping policy moving forward. *Id*. ¶¶ 79, 83. These allegations minimally support an inference of discriminatory motive. *Littlejohn*, 795 F.3d at 311. While Pasha fails to allege that he was similarly situated to the employees whose scheduling requests were approved by Fregjaj after the announcement of the no shift-swapping policy, his allegations suggest that he was similarly situated to the employees who were offered Gozlan's Wednesday shift.

Therefore, Pasha has plausibly alleged a plausible claim of discrimination with respect to the denial of his accommodation request.

19

Pasha's termination also constitutes an adverse employment action. *Terry*, 336 F.3d at 138 (listing termination of employment as an example of an adverse employment action). However, Pasha has not adequately pleaded that discrimination on the basis of his race, religion, ethnicity, or national origin was a motivating factor in his termination. He has not alleged that there were Tandym employees outside of his protected class whose employment history was similar to his and who were treated more favorably than he was. *Smith v. New York and Presbyterian Hospital*, 440 F. Supp. 3d 303, 331 (S.D.N.Y. 2020). Pasha alleges that two other minority Tandym employees were terminated from Stony Brook Hospital. Doc. 187 ¶¶ 130–31. However, he does not discuss the circumstances of the termination of one of those employees, and as to the other, a Black woman, the information in the complaint suggests that she was terminated for insubordination. Therefore, the terminations do not support an inference of discrimination because Pasha fails to allege that they were was similarly situated to him. *Littlejohn*, 795 F.3d at 312 ("adverse actions taken against employees who are not similarly situated cannot establish an inference of discrimination").

Pasha next argues that, pursuant to the "cat's paw" theory of liability, the Court should impute Title VII liability to the DOH for discriminatory comments made by non-DOH employees. Doc. 242 at 10. The cat's paw theory "refers to a situation in which an employee is fired or subjected to some other adverse employment action by a supervisor who himself has no discriminatory motive, but who has been manipulated by a subordinate who does have such a motive and intended to bring about the adverse employment action." *Vasquez v. Empress Ambulance Service, Inc.*, 835 F.3d 267, 271–72 (2d Cir. 2016). This theory may be used to support a claim of Title VII discrimination. *Id.* at 272–73. Permitting recovery under this theory is consistent with Second Circuit precedent that a "Title VII plaintiff is entitled to succeed, even absent evidence of illegitimate bias on the part of the ultimate decision maker, so long as the individual shown to have the impermissible bias played a meaningful role in the [decision making]

process." *Vasquez*, 835 F.3d at 272 (quoting *Bickerstaff v. Vassar College*, 196 F.3d 435, 450 (2d Cir. 1999)).  The Second Circuit has applied the theory in the context of an employer-employee relationship, finding an employer "liable under Title VII when, through its own negligence, [it] gives effect to the retaliatory intent of one of its – even low-level – employees."  *Id.* at 273–74.  The Court has also imputed the intent of a non-employee agent to an employer when the "employer exercises a high degree of control over the behavior of the non-employee."  *Menaker v. Hofstra University*, 935 F.3d 20, 38–39 (2d Cir. 2019) (internal quotation marks and citation omitted).

The Court finds that it cannot impute discriminatory motive of non-DOH employees or agents.  Here, Pasha alleges that McCormick, a DEC employee, advised the DOH to terminate Pasha because Pasha could no longer be staffed at Stop 3, which McCormick supervised.  Doc. 187 ¶ 129.  Even if McCormick's decision to no longer work with Pasha at Stop 3 was motivated by discriminatory animus, and McCormick's decision influenced the DOH's decision to terminate Pasha, the Court cannot impute discriminatory motive to the DOH because McCormick was not a DOH employee or supervisor, and because Pasha fails to allege that the DOH exercised a "high degree of control" over McCormick's behavior.[11]  *Vasquez*, 835 F.3d at 273–274; *Menaker,* 935 F.3d at 38–39.

Pasha also alleges that Tandym employees spoke to him disrespectfully and made comments that offended him.  Doc. 187 ¶¶ 91, 93, 97–98, 108.  However, he fails to allege that such behavior was motivated by discriminatory animus.  Even if it was, Pasha cannot impute discriminatory motive to the DOH because the employees were not DOH

---

[11] Pasha cites *Bautista* to support his argument that the Court, under the cat's paw theory, should not dismiss his discrimination claim against the DOH.  Doc. 242 at 7; *Bautista v. PR Gramercy Square Condominium*, 642 F. Supp. 3d 411, 422 (S.D.N.Y. 2022) (whether two related entities should be treated as a single employer is a question of fact not suitable for resolution on a motion to dismiss).  However, the Second Circuit has not established that joint employer status is relevant to analysis of cat's paw liability.  In any event, this Court has already found that Pasha failed to establish a joint employer relationship between the DOH and DEC.  Doc. 120.

employees. *Vasquez*, 835 F.3d at 273–74. Pasha also fails to allege that any of these Tandym employees played a "meaningful role" in the DOH's decision to terminate him. *Bickerstaff*, 196 F.3d at 450. Accordingly, Pasha has not pled that the DOH was motivated by Pasha's protected characteristics in its decision to terminate him.

In sum, while Pasha fails to plead that his termination took place under circumstances giving rise to an inference of discrimination, he sufficiently pleads a plausible claim of Title VII discrimination under the disparate treatment theory because of the circumstances giving rise to the denial of his accommodation request.

### 2. *Failure to Accommodate*

Separately, Pasha raises a Title VII claim of religious discrimination for failure to accommodate. To state a *prima facie* case of religious discrimination under the failure to accommodate theory, Pasha must plausibly allege that (1) he held a bona fide religious belief that conflicted with an employment requirement; (2) he informed his employer of the conflict; and (3) he was disciplined for his failure to comply with "the conflicting employment requirement." *See Cagle v. Weill Cornell Medicine*, 680 F. Supp. 3d 428, 435 (S.D.N.Y. 2023). However, there is no Title VII violation for failure to accommodate if the DOH establishes the affirmative defense of "undue hardship," which is "shown when a burden is substantial in the overall context of an employer's business." *D'Cunha v. Northwell Health Systems*, No. 23-cv-476, 2023 WL 7986441, at *2 (2d Cir. Nov. 17, 2023).

Pasha had a sincere religious belief, involving Friday prayers, that conflicted with the requirement that he remain at the testing site throughout his scheduled shifts and not pray at a nearby mosque. Doc. 187 ¶¶ 62, 63, 74. The DOH argues that intervening in Tandym's denial of Pasha's accommodation request would have presented it with an "undue hardship," given its largescale responsibilities during the COVID-19 pandemic and its reliance on Tandym to staff the testing site. Doc. 238 at 24–26. The cases that DOH cites to in support of its undue hardship defense involved accommodations that

22

would have presented substantial burdens to the employer.  *We The Patriots USA, Inc. v. Hochul*, 17 F.4th 266, 292 (2d Cir. 2021) (undue hardship for employer to violate state vaccination mandate); *Brown v. South Shore Hospital*, 762 F. Supp. 3d 191, 213–214 (E.D.N.Y. 2025) (undue hardship for employer to hire another employee to perform an employee's in-person duties).

Notwithstanding DOH's undue hardship affirmative defense, Pasha fails to support a *prima facie* case of religious discrimination under a failure to accommodate theory.  He does not allege that he was disciplined for failing to comply with any "employment requirement."  *Cagle*, 680 F. Supp. 3d at 435.  Instead, Pasha alleges that he complied with the requirement by praying at the testing site on Fridays, as opposed to at the nearby mosque, even after the denial of his accommodation request.  Doc. 187 ¶ 103.

### D.  Retaliation Claim

To establish a *prima facie* case for retaliation under Title VII, Pasha must show that (1) he engaged in a protected activity; (2) the DOH was aware of that activity; (3) he suffered an adverse employment action; and (4) there was a causal connection between the protected activity and the adverse employment action.  *Littlejohn*, 795 F.3d at 316.

Pasha argues that he engaged in the following protected activities:  (1) reporting to the DOH in November 2020 that Kellowitz, a DOH employee, told him "you people never do anything right" ("November 2020 report"); (2) reporting to the DOH in February 2021 that Pacheco, a DOH employee, called him a "snitch" ("February 2021 report") and (3) "threatening" to report McCormick to the DOH in April 2021 for his "Taliban" comments ("April 2021 threat to report").  Doc. 242 at 7.  He also argues that, even though the DOH was unaware of his threat to report McCormick's comments, such awareness was not required pursuant to the cat's paw theory of liability.  *Id.*  Lastly, Pasha argues that the temporal gap between his termination and any of these activities is sufficient to infer causation.  *Id.*

The DOH instead argues that the November 2020 report is too attenuated from Pasha's termination to constitute a causal connection.  Doc. 246 at 8.[12]  The DOH also argues that the February 2021 report was not a protected activity since it did not oppose a discriminatory practice.  *Id*.  Lastly, the DOH argues that cat's paw liability cannot be used to circumvent the requirement that the DOH had to be aware of the April 2021 threat to report.  Doc. 246 at 8–9.

As to the November 2020 report, assuming that Kellowitz's comment was made with discriminatory animus, only the November 2020 report could constitute a protected activity.  *Bryant v. Verizon Communications, Inc.*, 550 F. Supp. 2d 513, 537 (S.D.N.Y. 2008) (protected activity refers to an action taken to protest or oppose statutorily prohibited discrimination).

In addition, the five-month gap between the November 2020 report and his termination is too attenuated to infer causation.  The Second Circuit has "not drawn a bright line to define the outer limits beyond which a temporal relationship is too attenuated to establish a causal relationship between the exercise of a federal constitutional right and an allegedly retaliatory action."  *Gorman-Bakos v. Cornell Cooperative Extension of Schenectady County*, 252 F.3d 545, 554 (2d Cir. 2001).  However, courts have required a gap of three months or less between the protected act and retaliatory act in order to establish causation.  *Jackson v. New York State Office of Mental Health*, No. 11-cv-7832 (GBD) (KNF), 2012 WL 5862741, at *2 (S.D.N.Y. Nov. 15, 2022) (citing *Murray v. Visiting Nurse Services Of New York*, 528 F. Supp. 2d 257, 275 (S.D.N.Y. 2007)).

As to the February 2021 report, the report could not be considered a protected activity because Pasha did not oppose a discriminatory practice by reporting Pacheco's "snitch" comment.  *Bryant*, 550 F. Supp. 2d at 537.  Email correspondence in Doc. 242-1,

---

[12] The parties do not dispute that Pasha's April 2021 termination constitutes an adverse employment action and that his November 2020 report to the DOH could be considered a protected activity.

24

which is proffered by Pasha, indicates that Pacheco's comments were made in response to the fact that he reported her violation of a Stony Brook Hospital site policy to DOH, and not because of any discriminatory animus.  Doc. 242-1.

As to the April 2021 threatened report, the Court cannot impute liability to the DOH via the cat's paw liability because Pasha fails to allege that McCormick is a DOH employee or that the DOH exercised a "high degree of control" over McCormick's behavior.  *Vasquez*, 835 F.3d at 272–273; *Menaker*, 935 F.3d at 38–39.  Moreover, the DOH was never made aware of McCormick's comments.

Accordingly, his retaliation claim is dismissed.

### E.  Hostile Work Environment Claims

To adequately plead a claim for hostile work environment under Title VII, a plaintiff must plausibly allege that "the workplace is permeated with discriminatory intimidation, ridicule, and insult that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment." *Littlejohn*, 795 F.3d at 320–21 (quoting *Harris v. Forklift Systems, Inc.*, 510 U.S. 17, 21 (1993)).  The plaintiff must have perceived the environment to be abusive, and a reasonable person must also find the conduct was severe or pervasive enough to be hostile or abusive.  *Id*. at 321.  The court must assess the work environment based on the totality of the circumstances, including the "frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." *See Harris*, 510 U.S. at 23.

Pasha's hostile work environment claim is predicated on the following allegations:  (1) Tandym employees refused to assist him with tasks, took extended breaks, spoke to him disrespectfully, and threatened to have him fired; (2) Maldonado told Pasha "pray for more sun somewhere else," "when you get fired you can pray at home," "we don't need help from you," and "go back on break;" (3) Kellowitz told Pasha

"you people never do anything right;" (4) Pacheco called Pasha a "snitch;" and (5) McCormick called Pasha "Taliban" on two occasions.  Doc. 187 ¶¶ 91–93, 97–98, 108, 120–121.[13]  The DOH asserts that the comments made by Maldonado, Kellowitz, Pacheco, and McCormick were not sufficiently severe or pervasive; the DOH also argues that the comments made by Kellowitz and Pacheco were not tied to Pasha's race, religion, or national origin.  Doc. 246 at 6–7.  Lastly, the DOH argues that none of the above conduct can be imputed to the DOH because it was not the actions of a DOH employee or supervisor.  *Id*. at 7.

Pasha's allegations of ridicule and disrespect from Tandym employees do not satisfy the objective standard required to establish a hostile work environment. *Littlejohn*, 795 F.3d at 321 (coworker's harsh tones and impatience with plaintiff were insufficient to support hostile work environment claim).  Furthermore, Pasha fails to allege that such mistreatment was directed towards him because of his protected characteristics. *Sherman v. Fivesky, LLC*, No. 19-cv-8015 (LJL), 2020 WL 2136227, at *6, *11 (S.D.N.Y. May 5, 2020).

Pasha similarly fails to allege that comments from Kellowitz and Pacheco were motivated because of his protected characteristics.  *Id.*

Maldonado and McCormick's comments fail to support a hostile work environment claim because the comments are not sufficiently severe or pervasive.  While use of derogatory language directed to employees is inappropriate, occasional use of offensive language (even if from a supervisor) does not create a hostile work environment. *El Sayed v. Hilton Hotels Corp.*, No. 07-cv-11173 (DC), 2009 WL 5064354, at *8 (S.D.N.Y. Dec. 16, 2009), *aff'd*, 627 F.3d 931 (2d Cir. 2010) (use of the

---

[13] Pasha also alleges in his opposition that the Stony Brook site was hazardous because there was at least one reported staff fatality.  Doc. 242 at 6.  However, this does not support a hostile work environment claim because Pasha does not suggest that he was subjected to harassment or inferior working conditions due to his membership in a protected class.  *Sherman v. Fivesky, LLC*, No. 19-cv-8015 (LJL), 2020 WL 2136227, at *6, *11 (S.D.N.Y. May 5, 2020) (hostile work environment claim dismissed because plaintiff was not subject to hostility *because of* his race).

26

term "Terrorist Muslim Taliban" did not create an objectively abusive work environment).

Thus, based on the totality of the circumstances, Pasha's allegations fail to make out a claim for a hostile work environment under Title VII.

## IV.    CONCLUSION

For the foregoing reasons, the motion to dismiss is GRANTED in part and DENIED in part.  The Court grants the DOH's motion to dismiss the DOH employee defendants.  The Court also grants the DOH's motion dismiss Pasha's Section 1981 and NYSHRL claims, as well as his Title VII retaliation and hostile work environment claims.  However, the Court denies the DOH's motion to dismiss Pasha's Title VII discrimination claim.  The Clerk of Court is respectfully directed to terminate the motion, Doc. 237.

The parties are directed to appear for an in-person status conference on April 23, 2026 at 11:30 a.m. before the Honorable Edgardo Ramos in Courtroom 619 of the United States Courthouse, 40 Foley Square, New York, NY.


It is SO ORDERED.


Dated:    March 25, 2026
          New York, New York

_____
          EDGARDO RAMOS, U.S.D.J.

27